Form and versus acceptance indemnity in indemnity company. Okay, Mr. McKinley. May it please the Court. Jack McKinley speaking for acceptance. Let me get out of the way to begin with. The only negative point I see from my client's appeal, which is that it is a long trudge through boring facts. But after that, it's all uphill, because number one, I think it's an easy case. And number two, it involves a couple of important points. It's not easy because of the long slog part of it. It's easy because of the procedural part of it, which is the waiver issue. Acceptance should be before this Court today, if at all, as an appellee. It's not because Judge Hoyt took away the jury's verdict. Now, if acceptance were the appellee, RISIs would not have the ability to come to this Court and make any complaint about the sufficiency of the evidence to support the jury's answers to questions four and five. Because when a party doesn't make a Rule 50A motion for JML, it loses not only its ability to make a Rule 50B motion for JML, it also loses its ability to challenge the sufficiency of the evidence on appeal. And that's this Court's opinion in Maryland Casualty v. Acceptance makes that clear, among other cases. So if the judge had not overstepped his boundaries and rendered a Rule 50B ruling that under the rules he didn't have the authority to render, then there probably wouldn't even be an appeal, or if there were, it would be even easier than this one is, because RISIs would simply not be able to say a word about the sufficiency of the evidence. I'm suggesting to the Court that that intended outcome shouldn't be foregone simply because the judge overstepped his boundaries procedurally. So because there was, in fact, a waiver of a 50B motion, the JML ordered by the Court, of course, should be reversed, and Acceptance should get the benefit of what was intended, which is not even a need to examine the sufficiency of the evidence question. What did Judge Hoyt say about the waiver question that you just raised? He didn't really address it that I recall. I argued it. He initially said, yes, new trial, and I took that as accepting that the waiver argument was correct. But when he decided to set aside his new trial order and replace it with an order for judgment as a matter of law against Acceptance in favor of RISIs, he didn't really explain why he could do that. If there had been, for example, a subsequent trial, if he'd granted a new trial and then the issue comes up again, then, of course, he could have revisited it and granted a motion for JML in a second trial situation, if appropriate, if there had been the Rule 50A motion in a second trial situation. But with no intervening event, no intervening jury trial, I don't think it matters if he waits one month after trial or 12 months after trial. Nothing has happened but the jury verdict. So it is a Rule 50B situation, no matter what the passage of time is. Nothing has happened. He's still basically looking at the jury verdict and saying, I'm going to set it aside, and he doesn't have the power to do that under Rule 50B without a Rule 50A motion. So that, to me, is the easy part of the case. The harder part of the case that takes up most of the briefing is the substantive part of the case, and it's important because it implicates not just Acceptance's right under the Seventh Amendment to a jury, but every party's right, and this matters to, it should matter to everybody on every side because you never know which end you'll be on. I know that I and many other practitioners love to go to federal court because our district judges will actually make legal rulings, and that's a huge positive factor to be in federal court. But it shouldn't be that a judge takes that power so far that he takes away a jury verdict, and that's what happened here. Now, I haven't really, I say that it's a long slog, but I really think it's an easy one because on Questions 4 and 5, starting with Question 4, we're not looking at the need to make a circumstantial inference as we would in an arson finding. We're not challenging the arson finding. It was against Acceptance. But on Question 4, was there a breach? Did Reese's breach the condition? That's not a circumstantial evidence issue. That doesn't require inferences. That's resolved by direct evidence. Admittedly, it's not a lot of direct evidence, but it's one very, very powerful piece of direct evidence, which is the denial letter put in the record with no limitation by my client that said you didn't give us any records. And as I've explained to the court with citation of this court's precedent, that is, was, of course, it was hearsay. It was admitted for the truth of the statement in it, and it was received as such. There was no challenge to it. There was no need to put on a witness. This court's precedent, as well as other circuit courts, says that, of course, being hearsay, it comes in for its truth. The United States Supreme Court, as well as this court, has said in Anderson v. Liberty Lauberti and many other cases that the move-in, to take the same standard in a summary judgment context, the non-move-in's evidence is to be believed. That's what the Supreme Court said in Anderson v. Liberty Lauberti. Now, on the question of your records, Judge Hoyt said the record in the case showed that the means for obtaining those records were in your hands, regardless of whether Reesey's provided the records. That's my gloss on what he did. Judge Hoyt said, correct me if I'm wrong. He did. So what is your response to that, that the records were otherwise available to you? As I've explained in the brief, Your Honor, the reference by Judge Hoyt was to a vaguely identified authorization for, quote, financial records. That authorization isn't in the record. We don't know what that authorization said, but by the nature of an authorization for records, it's directed to third parties. This isn't a situation where we're receiving records. I'm sorry. An authorization from whom to whom? Clarify that. I don't understand what authorization you're talking about. Judge Hoyt was referring to an October letter from my client, the lawyer for my client, the predecessor lawyer, to Mr. Mercurio, the predecessor lawyer for Reesey's, saying we acknowledge receipt of various things. That included the records that had been discussed as 1 through 219, and it also included authorizations for financial records. And that's what Judge Hoyt was referring to. An authorization, of course, is not the financial records itself. So that is zero evidence that that acceptance received financial records. Judge Hoyt's implication was, well, you got an authorization for financial records. You should have followed up on it. You would have gotten what you needed. You don't have a complaint. That isn't true because, as my briefing takes great care to point out, the records that were relevant, the only records that would have mattered, were the profit and loss statements, the balance sheet, the detailed financial records kept by Reesey's itself on its own computer, which it had for 22 months after the fire. It never produced any of those records. Cherise Foreman testified in her deposition and was impeached at trial with the evidence that she never downloaded that, ever. Not any of it. She didn't download it when acceptance asked her to provide those records during the 11 months of claim handling. She gets a denial. She still doesn't produce the records. And they're there for 22 months after the fire. Those are the only records that would have been relevant to show whether the business was making money on a month-over-month basis. And so getting third-party records wouldn't have done that. Stepping just back, I mean, because your brief puts it very strongly that sort of there will be chaos and contract can't matter if cooperation clauses aren't upheld. But here, and I think you're agreeing to this a little bit, the cooperation clause in question, can you quote it in the policy, is it that they have to allow you to examine or is there a provision that they have to actually provide to you certain documents? I think that would be a distinction without a difference in the modern world. Well, what's the language you're quoting? Well, there are two parts of it. The one is I think it's Condition 3, Subpart 6, which is you must provide books and records. And it specifically says books and records. And it does say examine, yes. Okay, let's be as precise as possible. Six, as often as reasonably required, permit us to examine and inspect your books. Right. But the denial letter that you're saying it is thin evidence says you didn't provide us to these items. Is that it? Well, I think, Your Honor, the condition was framed at a time when there was no electronic storage. These policy provisions date back many decades. Okay, maybe a different way for me to get at this is where in the record will I find the request that specifies items that she didn't then give you? Oh, that's the initial letter. That's the January, within a week after the fire, there's a letter. That articulates these financial documents with some level of particularity? Yes, it uses the very language of the policy. It quotes. It says provide to us financial records. It quotes the condition you just read, and it says we want you to provide these to us. Okay, and then the denial letter is what you're primarily relying on, although the cross of the lady was sort of tortured. But the denial letter in turn is saying those were never given to us? The denial letter is unequivocal, positive, direct evidence that they were never provided. And under this Court's precedent, the United States Supreme Court's precedent, that is to be believed for the purpose of a JML. Now, obviously, the jury could have disbelieved it, but the jury didn't disbelieve it. So she breaches the contract, she forfeits the insurance. Correct. Well, no. No. That's question four. Then we get to question five, and admittedly, for question five, there's not really direct evidence. This is the prejudice of materiality. Prejudice, right. However, I would argue to the Court, I think that it is manifestly true, that given the standard for materiality that this Court has discussed and that the Texas Supreme Court has discussed, there's only one reasonable answer that can be given to that question, and that it's what's prejudicial. It was a material breach for the same reason that it's a prejudicial breach. The records of an insured regarding its operations, its books and records, in an arson case are crucial to evaluate motive. Motive is essential to prove an arson. Regardless of who might have been the arson? Well, if the insurance company thinks it's the insured, the only way they could possibly prove that is to show a motive. They're not going to be able to show a motive without those books and records. So, yes, they're crucial. And in this case, there was no suggestion that anybody else was the arsonist except for Reese's. So that's where the district court said if the jury found it wasn't Reese's, then we don't really need to worry about the rest. And you have to be saying that's not a logical leap. No. And I've explained this in the briefing. The reason that Question 5 is not rendered moot by the arson, the no to the arson in Question 1, is because Question 1 did indeed ask about arson by Reese's. The jury said no because they didn't have all the elements they needed to say arson by Reese's. Well, admittedly, we admit, one of those elements was missing. We never could prove motive by Reese's. And the reason we couldn't prove it is because we couldn't get the records that are uniquely relevant to it, and that is the books and records that would show are you making money or are you not making money on a month-over-month basis. For sure, in your first year of operating a restaurant, you're going to be able to show a loss on your tax return because you're going to have so much startup expense, it'll overwhelm your profit unless you're really profitable. That's not the question. Tax returns wouldn't help. It's the month-over-month. Are you bleeding cash or are you making cash? And so they would never produce those, although it was admitted that they had them. So the jury evaluating Question 5 is, first of all, going to realize, well, this doesn't even matter unless there's arson by somebody. I mean, if there's no arson, there's no issue on Number 5. There's no prejudice. There's no harm. Those records mattered only to arson by Reese's. So if the jury isn't thinking arson by Reese's is an issue here, they're not going to be saying yes to Question 5. It would be irrational. As well, any jury would be looking at the totality of the circumstances and saying if you're saying you have the records and the insurance company is asking for them, you're obligated under the policy to give them, why don't you give them? Then you're denied coverage. Was that argued to the jury? In other words, you should answer 5 yes because if you can't find from 5 yes to 1, we're prejudiced. Was that argument made to the jury? Your Honor, I spent most of my time in argument talking about arson. I thought that Question 5 pretty well answered itself. It seemed rather obvious that if you're an insurance company and you need these records and they're uniquely relevant to arson, they're the only possible proof of motive. So no argument was made to the jury on that? I don't remember how much time I spent on it, but I don't think I spent much. I spent most of my time arguing arson. Did you spend any is the question? I don't recall spending any. I thought there was only one possible answer to that and so did the jury because it's inconceivable. To this day in front of this Court, they still haven't come up with, haven't articulated any cogent explanation why you would have the records and not produce them. Their explanation is, their argument is, we produced them, but they have no evidence that they produced them. The only evidence is from acceptance that they didn't produce them. So if evidence means anything and if briefing rules mean anything, you've got to support your argument with record citations and the R&A. I see that my time is up. Time for rebuttal, Mr. McKinney. Thank you. Thank you, Mr. Pittman. May it please the Court. Initially it was acceptance that had the burden to prove that there was a specific provision in the contract that was breached. Mr. McKinney just argued to the Court that there were provisions in the policy that required a certain information to be turned over and that's simply not true. It's also not true that there was specific information that was requested of Reese's that was not turned over. And I'll cite the Court in our brief, in our opening brief on page 33, we've extracted the exact language from that policy. And that exact language says that AIC acceptance has the right to examine and audit books and records as they relate to the policy. It also says in paragraph 3, the only other provision in the contract that deals with the issue, it says that as often as may be reasonably required, permit us to inspect the property, proving the loss or damage, and examine your books and records. So that's what the policy says. Did you make your books and records available for them to examine? Absolutely. When? I mean, where from the record will we find that? Yes, Your Honor. There are several places in the record. Initially, and Reese's acceptance admits to this in their brief at page 38, they admit that it received books and records related to the billed-out inventory. The 222 pages. Well, billed-out inventory isn't profits and month-by-month profits and expenses, income, all of that. Correct. And I'm going through all of the phases of the two items in the policy. So that relates to one, proving the damage of the loss. The other provision is Ms. Foreman testified at trial that she provided all of the records to the attorneys. That's on the record at page 1663, again at 1671, again at 1675. She testified that she provided, quote, receipts, invoices, bank statements, and tax returns. That's in the record at page 1663. Acceptance hired an attorney. It was Mr. Johnson. They hired an attorney during the policy evaluation stage. So everything that happened, it didn't happen between AIC and Reese's. It happened between the attorneys. So Mr. Johnson, the attorney representing AIC, in a letter he testified that he received information and he turned the information over to AIC. That's their attorney, and that is in the record. In addition to the receipts and invoices and bank statements and tax returns that she sent over, they provided an authorization. The authorization was broad and all-encompassing. It didn't say you're limited to this. It didn't say you can only go to the IRS. It didn't say you can only go to my bookkeeper. It was all-encompassing. So with those authorizations, what that means, Your Honors, is that either AIC intentionally failed to gather records from a third party or it means they failed to inspect the records or it means that they're using the authorization as a pretext. If you look at Mr. McKinney, has it been unable to cite to anything in the record? Now, Mr. McKinney testified that they provided a request to Reese's. They did not. If you look at the letter that they provided, it said that we have the right to inspect your books and records. There's absolutely nothing in the record, and Judge Hort was very clear when he talked with Help me out a little bit here. Is your argument to us as to, obviously, a cooperation clause, you wouldn't dispute that a business needs to give over its records if it's properly asked, it's essential to the coverage. Correct. So then the answer to that would have to be one of four. We did give it over, and the jury interrogatory is wrong. There's no evidence to support it. Correct. Then they say, well, the denial letter is pretty darn thin evidence, but it's there. Or you would be saying we didn't give it over because the request was too indistinct, and therefore we didn't need to give anything over. The jury, therefore, was wrong. That would be a separate argument. Or we didn't give it over, and that was a mistake, but it's immaterial. And the fourth one is none of this matters because the answers to one and two make four and five irrelevant. As I understood the district court, that's what the district court relied on. No, that's not all that the district court relied on. But to answer your question, it's several of those. We initially start with the policy. The policy, again, requests permission to examine the books and records, and the record is clear that they were able to And so we can look at the receipts and invoices that are in the record, and we can determine from those month by month whether Reesey's was losing money or making money. No, absolutely not. And that's where, but the policy also says permit us to make copies from your books and records. Correct. So if the jury made a finding that you didn't turn those over, is your argument that there is no evidence to support that finding? Correct. There are several issues here. Again, we're jumping to the other issue that I'll get to, but I can address that directly. The jury sent a question back, and their question was what does this authorization, basically what does this authorization mean? So the jury is confused as to what it means. Does it mean that they requested information and didn't get it, or does that mean that they requested information or didn't request information? So the jury is confused, and again, sending that question back to the district court saying, what do you mean by this authorization? And I think Judge Hort got it right when Judge Hort said that you have the right to examine the books and records. If they give you an authorization, that's your ability to exercise that right that you have. But even more broadly— Well, what's the case that says giving authorization means you don't need to comply with a duty to provide? That you don't need to— Just because you give someone authorization, that doesn't relieve you of a policy obligation to give them financial statements. Well, the authorization requested by ASC. They requested it, but you can't then just say, well, you requested it, you didn't get it, therefore we don't have to comply with the coverage terms. Your Honor, there's absolutely nothing in the record about any document that wasn't produced. Except the denial letter. And I admit it's pretty darn thin, but why wouldn't a jury be able to draw an inference from that? It doesn't say what was not produced. We know what was produced. I thought their lawyer said what wasn't produced. No. Their lawyer was listed on their witness list, the guy who received the records. Now, Ms. Foreman testified that she delivered all of those records to the attorneys. Tax return, bank statements, everything she had. She didn't have anything else. So she cannot prevent you from examining something that she no longer has. But am I oversimplifying it just to say the jury did make this finding? And is your argument that there was no evidence to support the finding? Correct. That's your argument? Correct. Okay. Well, my first argument is that they complied with it. And so therefore this is a question, and I'm the appellate lawyer, not the trial lawyer, but interrogatory number four should never have been submitted to the jury. Because again, the information, and that's what Judge Hoyt eventually discovered after going back and looking at it. He said, well, this is something because there is no evidence in the record of anything. There were months that went by. And Judge Hoyt was very clear to Mr. McKinney. As a matter of fact, what Judge Hoyt said is he said that he told AIC that they had to put in the evidence that it sent requests to receipts for the financial records to be able to argue that they asked for it and didn't receive it. That's what Judge Hoyt told Mr. McKinney. Mr. McKinney told the judge that I don't need to enter that. All I need, and this is in the record on page 1092, he said all I need to enter is this letter. So the judge notified him while the evidence was still open that in order for you to prevail under this theory, you've got to show that you actually requested something. Because it was AIC's burden to show that there was a breach, that receipts breached the contract by either not allowing them to examine, and that didn't happen because they sent an investigator out twice to talk to Ms. Foreman. They talked to Ms. Foreman's assistant. They had her computer there, she said. She reported the information and provided that to the attorneys. So that's all in the record. That's in her testimony. I thought there was conflicting evidence about what was in the computer. I thought there was a conflict in the evidence about that. No. There is a... AIC didn't put on a witness with any conflicting testimony. So all the evidence you have is from Ms. Foreman saying this is what was on the computer, this is what I produced to the attorneys. It included bank statements, invoices, tax returns. They didn't put on a witness from AIC to say they didn't receive what Ms. Foreman said she gave them. They didn't put on a witness to say they didn't have the authorization or didn't utilize the authorization. They didn't put Mr. Johnson, their attorney on, who Ms. Foreman gave the information to. All right. So which side's attorney did Foreman say she gave the records to? Her lawyers or their lawyers? Well, she said the attorneys. So she only had one attorney, so I'm assuming when she... And, again, I'm just looking at what's in the record. All right. So we can assume she says she gave all of her books and records to her attorney. Is that right? Well, she said the attorneys. That's her testimony. I understand, but I'm asking what the attorney means. That's what I... It's reasonable to assume that what she's talking about, gave them to her own... I mean, she wouldn't be sending stuff directly to the other side's lawyer. That wouldn't make any... That doesn't happen. Well, here's... Your Honor, the fundamental issue is it's AIC's burden to show that it was not... No, no, no, no. Let's answer my question. Okay. All right. I'm trying to get it clear that she says she sent all of her books and records to an attorney. We can only assume she was talking about her attorney. I think that's a fair assumption. All right. Is there anything in the record, or maybe you can tell us as an officer of the court, what happened? Were there any records that she gave to her attorney that were not either produced to or made available to acceptance? Not aware of anything. There's nothing... There's no record from AIC's attorney saying, we don't have this, that we're lacking this. I'm talking about internally from your side. No, no, no. I'm saying from AIC. All right. But from your side of the case, was there anything that she produced to her attorney or attorneys that was not produced or made available to acceptance? Not aware of a single thing, Your Honor. So the answer is no. There was nothing like that. There was nothing that she didn't, that she produced to her attorney that he did not then produce to the... So you can positively represent as a fact that everything that was given to Ms. Foreman's counsel, that counsel turned over either to AIC or AIC's counsel? Oh, I can't represent that. I can only represent that... Well, how do we get the answer to that question? Well, that was Mr. John AIC's attorney. How can AIC prove... They don't know what he got. Well, no. Well, what I would have done as a trial lawyer is I would have called Mr. Johnson to the stand and said, did you receive financial statements from Reesey's? Did you receive tax returns from Reesey's? He was their attorney. He was not their trial attorney. That doesn't really answer the whole question, which is what happened internally on your side. So here's what you need to do. You, as an officer of the court in this case, need to give us a letter telling us from your side whether there were any books and records that were produced to you or your predecessor attorney, in this case representing Foreman and Reesey's, that were not produced or made available to acceptance. I'm asking you that not as an evidentiary matter but as an officer of the court to give us that letter. I will. All right. Now, Your Honor, the other issue is the jury found that there was no arson, and so we don't even get to the second point of whether there was the production of financial documents or not. They found that there was no arson. You've got to show that the fire originated from an incendiary source initially. That's a part of showing the arson. So we don't even have to address the financial issues. The jury looked at the information that came from the gentleman they hired, Mr. Chapman. They looked at that. Mr. Chapman made a conclusion. He made a conclusion as soon as he went out there that there was some arson. Now, if they said arson attributable to Reesey's, that doesn't mean the jury could have thought there was arson, but they couldn't say that it was attributable to Reesey's. That's fair. But when you look at the evidence, the evidence in the record shows that there was an arson investigator from the Houston Fire Department. He concluded that it was from an electrical source. So he was the first person who went out there. Mr. Chapman agreed that there was issues with chain of evidence. So by the time he came out there, you'd had ten fire trucks and you'd had construction crews going through the place damaging items. So the most objective piece of evidence as to the arson comes from the Houston Fire Department. They said there was an alarm when they came out there, which, you know, got rid of their AIC's alarm claim that there was no working alarm. And they also said that the Houston Fire Department said that it came from an electrical source. So it was an electrical fire. Even AIC's own, the other expert, came out there and said it's an undetermined source. The only person who said it was arson was Mr. Chapman, who came out there and within a few minutes of arriving there, made a conclusion that it was arson, despite that he wasn't there to determine, you know, a motive. He was just there to determine a cause and origin. I thought he found fluids, incendiary fluids in several different places. No, he found evidence that would be common in a bar and restaurant. He testified that on page 1971 of the record that it's common for ethanol to be present where you've got a bar where there's beer and wine and cleaning supplies. So, but more importantly, if you look at Mr. Chapman, he viewed a videotape of the fire. And this is the evidence that the jury saw. So the jury saw the full progression of the fire. They did not see a single person spraying an accelerant. They did not see a single person lighting the fire. So it was unreasonable for, and Justice Owen, you had a question about whether they thought it was recent. Well, the evidence showed that it was not from an incendiary origin for the fire. So that's why we believe that the jury's determination was that it was an arson, which means that, you know, whether the financial documents were produced or not. And then there was no prejudice because Mr. McKinney was able to ask Ms. Foreman about the financial condition. Ms. Foreman admitted that the restaurant, you know, lost, as most restaurants do in the initial year, she admitted that it lost money. So they were able to argue that with the jury. So, Justice Owen, if Mr. McKinney is able to argue that using that evidence, then we think that the jury would have still found that it was, you know, if they believed that there was some financial motive, they still could have found for AIC on interrogatory number one. So we believe that the evidence showed that there was no arson. So therefore, their finding in number one was because there was no evidence that it was arson. Therefore, you know, whether the records were produced or not was not ground. And going further to Mr. Chapman came out in January of 2012, and if it were arson, if they really believed it was arson, why did it take them 11 months? He came out on January 6th. It wasn't until December. And then there's no evidence as to what was happening during that time period. Again, there's absolutely not one letter from AIC to RISI saying, here are books and records that we need. Here's what you haven't produced. As a matter of fact, Mr. Johnson, when he sent the letter over in October, he told RISI that this information, the financial records and authorization have been provided to AIC. So therefore, that information was provided. And, Your Honors, with respect to the motion for a new trial that RISI has prepared, again, I believe that there was bad faith for the arson investigation, bad faith in terms of the request for prejudice from the records. And there was clearly RISIs asked for economic damages, extra contractual damages. Those are in the complaint. Those are in the joint pretrial order, the final pretrial order. During the trial, RISIs introduced information showing that they had lost revenue from closing the location. They had lost revenue from not being paid so they could use that money to reopen the restaurant. They lost a lease. So there was a lot of evidence in the record of economic damages that she sustained. Again, we believe because they were using the alleged arson, the alleged production of non-production of records as a pretext, we believe that, you know, the bad faith is clearly there. So therefore, the judge should have given an instruction to the jury that they should consider whether there was bad faith because, again, there's nothing in the record showing that they requested a single record that wasn't produced. The authorization is just for determined, allowed them, that's now in their control. And, again, there's nothing in the contract. If you look at the clear language of the contract, there's nothing in there that requires RISIs to recreate records, and there's nothing that says that it wouldn't be proper for them to just submit the authorization. So, Your Honors, we ask that the court remand this to the district court for a trial limited to damages for RISIs. Thank you. Thank you, Mr. Pittman. Mr. McKinley, you saved time for a bottle. Just briefly, Your Honors, let me address the arson comments that were just made, even though I think they're very peripheral. The Houston Fire Department investigator came out with a team, but he was just someone on a team. There's no evidence that he was an arson investigator. There certainly is no evidence an arson investigation was done. The evidence is clear that there was not even any light. It was the middle of the night. All they had was flashlights. Nobody could possibly have done an arson investigation in that. Counsel notes the jury didn't see the arson committed on the videotape. Of course, almost no one ever sees an arson. It's circumstantial. But that's a moot point. Acceptance didn't win the arson issue. The only reason that it's relevant is because we're debating whether it can coexist with the yes to Question 5, and I've explained why it can. Counsel notes 11 months to the denial after the fire. Well, that's because acceptance is waiting and waiting and still waiting on records. Well, if there's no evidence of arson, I don't see how in the world you were, your client, there's evidence to support the jury's verdict on 4 and 5. Oh, you're absolutely right, Your Honor. Absolutely right. What was the evidence of arson? It's detailed in great length. I thought there wasn't there. Didn't somebody's expert, your expert, testify there were flashpoints on the ground? Inconsistent burn patterns and accelerant, multiple points of origin. Those are the three hallmarks of arson, and they were all present. You said that Ms. Foreman said that she was losing money. I'm sorry, your brief said Ms. Foreman testified that the business was profitable. He says she testified that they had lost money. No, there's no evidence. She conceded that they lost on their income tax returns. They declared a loss. There's no evidence that they were losing money on a month-to-month basis. Did she testify that they were profitable? Your brief says she says they were profitable. She did not ever testify they were. Why did your brief say she said it was profitable? She said they were. She claimed they were making money on a month-to-month basis, but on the tax returns they were declaring a loss, and that's because of startup expenses. What mattered to arson is the month-to-month. If you're bleeding cash month-to-month, you have a motive. But she did testify month-to-month they were making money. She claimed they were. Right. And that's exactly why we needed the records to verify or controvert that claim, and that's exactly why every insurance company in this situation needs records, and that's why it's so crucial that they be provided as indicated by this court's unprecedented. You couldn't tell from her bank records and the receipts she were given whether she was net gain or loss? No. You can't. You have to have the profit and loss records on a monthly basis to know. But profit and loss records are generated from what underlying documents? Profit and loss records come from the records of sales and the records of expenses. Your bank records are just going to show. Well, what receipts did she turn over? She had a point-of-sale system that would only register sales, and they had those records and they never produced them, as explained in the brief counsel had told me, and that's in the post-judgment filing. Counsel told me that they had them and they never produced them. Okay. And what about expenses? No record of expenses at all, and that was crucial. That was the essential part of what could only have been obtained. So there weren't checks in the bank statements for expenses? I have no bank statements. I have no bank statements. What bank records were produced? None. Zero. They said bank records were produced. They did not produce bank records. They have referred to an authorization. Counsel says the authorization was all-encompassing. It was not. It was a general reference in a letter by a lawyer for acceptance to, we have your authorization for financial records. It doesn't say what kind. There's no evidence that bank records were authorized. There's simply nothing in the record to support the assertion that it was all-encompassing. Certainly there's zero evidence that bank records were produced, absolutely none. And, by the way, there was a reference by counsel to the final, the denial letter, not citing what records weren't being produced. On page five of the denial letter, which is at record 2339, it quotes again the condition, subpart 6, your books and records, and subpart 8, cooperate with us in the investigation of the claim. And then it says we're denying because you were requested to provide financial information relating to your business. Despite these numerous requests, the requested financial information was never provided. You have failed to comply with an essential policy requirement. That's in the denial letter. According to the United States Supreme Court and this Court, that is evidence that must be accepted as true. And that's the only evidence. All right. Thank you, Mr. McKinley. Your case and all of today's cases are under submission, and the Court is in recess under the usual orders.